Michael A. WILLIAMS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: Sept. 26, 1984.

Decided: March 8, 1985.

**1130**

Robert C. Wolhar, Jr. (argued), Wolhar & Moore, P.A., Georgetown, and Theophilus R. Nix, Wilmington, for appellant.

Gary A. Myers, Deputy Atty. Gen., Georgetown, for appellee.

Before HERRMANN, Chief Justice, HORSEY and CHRISTIE, Justices.

CHRISTIE, Justice.

In April of 1983, defendant was found guilty of first degree robbery and second degree conspiracy by a jury in Kent County Superior Court. On appeal defendant asserts that prejudicial errors occurred during his trial, and that he is entitled to a new trial.

The record contains evidence which would support the following account of the pertinent facts. On February 8, 1982, defendant received a telephone call from a friend by the name of Tyrone Baxter, who inquired as to whether defendant would drive him to the bus station at State Road, Delaware. After Baxter offered to pay for defendant's gas, defendant told Baxter to call back an hour later, when he had finished cleaning his car. When Baxter called back defendant agreed to do the requested driving.

When defendant arrived at Baxter's home at about noon, he was introduced, for the first time, to James Riley. Defendant testified that while at the house, Baxter showed him a gun he had been keeping in his basement.

Later, as defendant was driving Baxter and Riley to the bus station, Baxter asked defendant to stop at a nearby liquor store. As they approached the liquor store, Baxter stated that he and Riley needed to make some money, and they (Baxter and Riley) discussed robbing someone among themselves. Defendant overheard this discussion, and stated that he wanted no part in their activities. Nevertheless, defendant continued to drive, and he parked at an apartment building near the Sandbar Liquor Store. Defendant testified that he then tried to visit a friend who lived in the apartment building but, since the friend was not at home, defendant returned to his car. In the meantime, Baxter and Riley went to the liquor store and robbed the proprietor. In the process, Riley shot the proprietor.

Defendant was in the car when Riley and Baxter returned from the liquor store. The pair told defendant that they had taken some money and shot the proprietor. Defendant then drove them to the bus station, where the two men changed clothes. Baxter paid defendant $20 for his gas expenses. Baxter later warned defendant not to discuss the incident with anyone, or

defendant would then be implicated in the crime.

About ten weeks later, defendant's mother was questioned by the police. Defendant then retained an attorney, who contacted the prosecutor in an effort to gain some favorable treatment for his client in return for defendant's cooperation with the prosecution.

According to a letter signed by the prosecutor and dated May 3, 1982 (subsequently amended on May 8, 1982), defendant and the prosecution made an agreement. The State was to grant defendant "use and transactional immunity" as to possible homicide charges, if he was not, in fact, directly involved in the murder. The State made it clear that it was not then agreeing to grant immunity as to the robbery or the conspiracy charge. However, the prosecutor did agree to dismiss the latter charges if defendant subsequently passed a lie detector test indicating his lack of participation in the robbery. Finally, defendant and the prosecutor agreed that if defendant gave what turned out to be false information to the prosecutor, the "deal" would be voided.

On May 8, 1982 defendant, his attorney, and his mother met with the prosecutors and detectives assigned to defendant's case. In a recorded conversation, defendant's attorney first read the letter summarized, in part, above, and then explained the implications of the agreement to defendant. He told defendant that:

Any statement that you make today pertaining to the Feeley incident will relate not only to the murder but also to the robbery and conspiracy. That means that any statement you make regarding the matter at all can be used against you in the robbery or the conspiracy charge and it can be used in a court of law and since an attorney is present and advising you the chances are that you will not be able to attack any statements that you make ... if that polygraph shows your lack of knowledge with respect to that incident, the State will not prosecute you

for the robbery and conspiracy; if, however, the polygraph examination shows that you were being deceptive, you're not telling the truth about your knowledge or if you are in fact lying about your knowledge, that information can be used, I assume, in a court of law against you and the State will proceed with the robbery and conspiracy charges. Do you understand that? [Defendant responded], "Yes, sir."

Similar instructions were repeated by defense counsel and the prosecutor several times during the course of this discussion. Defendant then proceeded to give, what he asserted, was a truthful account of the commission of the crimes and his limited participation.

On June 7, 1982 defendant was formally charged with two counts of first degree murder, robbery, conspiracy, and possession of a deadly weapon during the commission of a felony. Defendant pleaded not guilty to all charges.

Defendant was subsequently called upon to testify at the Riley trial. In return for his agreement to testify, the State entered *nolle prosequis* as to the two murder charges and the weapons charge then pending against the defendant. At the Riley trial, defendant testified as to the extent of his involvement in the crimes. He admitted, under oath, that he had lied when he gave his prior statement to the prosecutor at the May 8 meeting.

Defendant was subsequently tried and found guilty of robbery and conspiracy to commit robbery. During defendant's trial the State offered, as an exhibit, defendant's prior testimony at the Riley trial, in which defendant had referred to the statement he had made on May 8 and admitted lying during that "plea negotiation" with the State prosecutors.

Defendant initially asserts that the trial judge erred as a matter of law, when he ruled that statements made by defendant to the prosecutors during what was alleged to have been "plea negotiations", could be

used in a limited context in the State's case against defendant. Defendant insisted that the statements themselves, and any reference to them, were inadmissible under D.R.E. 410.[1]

D.R.E. 410 provides the following:

Except as otherwise provided in this rule, evidence of a plea of guilty later withdrawn with court permission, or a plea of nolo contendere, or of any offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer. However, evidence of a statement made in connection with, and relevant to, a plea of guilty, later withdrawn, a plea of nolo contendere or an offer to plead guilty or nolo contendere to the crime charged or any other crime, is admissible in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record and in the presence of counsel.

■ The Supreme Court has indicated that when properly administered, plea bargaining is an essential component in the administration of justice. *Santobello v. New York*, 404 U.S. 257, 260, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). D.R.E. 410 seeks to foster candid discussion by the defendant, and thereby encourages proper plea negotiations and the resolution of criminal charges by means of a consensual agreement. *United States v. Herman*, 544 F.2d 791 (5th Cir.1977). Such objectives would be difficult to realize if each defendant were concerned that statements made in the course of negotiating an agreement might later be used against him in court. *United States v. Herman*, 544 F.2d at 797; *United States v. Verdoorn*, 528 F.2d 103, 107 (8th Cir.1976). Although D.R.E. 410

must be applied with a view to the apparent legislative intent of encouraging plea negotiations, the scope of the rule does have some limits.

■ In determining whether discussions, such as those which took place in this case, are to be regarded as "plea negotiations" within the meaning of rules corresponding to D.R.E. 410, courts have considered whether the defendant had an actual subjective expectation to negotiate a plea at the time he made his statements and whether that expectation was a reasonable one. *United States v. Robertson*, 582 F.2d 1356 (5th Cir.1978). As part of this evaluation, courts will examine the *quid pro quo* of the negotiating process to insure that each party has actually given something of value for what he received in return. *United States v. Geders*, 566 F.2d 1227 (5th Cir.1978); *United States v. Cross*, 638 F.2d 1375 (5th Cir.1981).

■ It is argued here that the basic tenor of the May 8 discussions was that of a plea negotiation. Defendant was indeed hoping for concessions (in the form of immunity as to the murder charge and dismissal of the remaining counts) in exchange for his truthful testimony concerning his actions and those of his co-defendants. We accept defendant's position that he entertained a reasonable expectation that the statements he gave the prosecutor would have been inadmissible, if truthful. But therein lies the obstacle which defendant cannot overcome. His own counsel explicitly stated at the start of his conversation with the government, that if any of his statements about the robbery and conspiracy were not truthful, such statements could, in and of themselves, be sufficient to convict him. This important observation was repeated by defense counsel and the State prosecutor at least two additional

---

**1.** Defendant also asserts that these statements are inadmissible under D.R.E. 408, but it is apparent that that rule is so worded as to apply only to civil cases. Furthermore, even if the rule were applicable, the evidence in question

would not be excluded under the terms thereof because of the limited purpose for which the evidence was offered (to attack defendant's credibility).

times during this conversation. Moreover, defendant had been fully apprised as to all possible consequences of his failure to speak truthfully, and the voluntary nature of his statements was never challenged by him. Therefore, the unambiguous agreement entered into between the State and defendant, to which all parties voluntarily consented, was conditional upon the accuracy of defendant's statements.[2] The statements were not a part of the negotiation process; rather, they were part and parcel of what the State bargained for. If Defendant's statements were subsequently discovered to be false, the agreement clearly contemplated the State's use of those statements at defendant's trial.

Such an agreement amounts to a contract between the parties, which can supercede the applicability of D.R.E. 410. *United States v. Stirling*, 571 F.2d 708, 732 (2d Cir.1978). Defendant's subsequent breach of that agreement brought into play, under the terms of the agreement, what amounted to a waiver of the exclusionary provisions of D.R.E. 410.

Our ruling in no way undercuts the rule. We only hold that because defendant did not fulfill his part of the "deal", he is, according to the very terms of his own agreement, (as it was clearly explained to him) no longer entitled to the protections afforded by D.R.E. 410. The protections of D.R.E. 410 are designed to encourage candid dialogue in plea discussions. Here defendant admitted that he lied under circumstances in which he had been warned that, if he lied, his statements could be used against him. The policies underlying

D.R.E. 410 would not be furthered by protecting such deliberate, untruthful statements.

It should be pointed out, however, that the statements defendant actually made pursuant to the agreement on May 8, 1982 were never admitted into evidence against him. These statements were merely referred to during defendant's testimony at the trial of James Riley. At that time defendant admitted that he had lied during his May 8, 1982 meeting with the prosecutors. This admission, under oath and with the benefit of the advice of defendant's counsel (who was "in and out of those" proceedings) constituted a waiver of the confidentiality of his prior statements. The State, moreover, merely sought to use defendant's admission that he had lied to the prosecutors to impeach defendant's credibility, and the fact that he had admitted lying precludes a ruling by this Court that such a statement was inadmissible.[3]

## II

After the jury had returned its guilty verdicts, defendant moved for a new trial, asserting that two jurors knew a defense witness. The trial judge conducted an evidentiary hearing to explore the allegations made by defendant. At this hearing, the trial witness testified that she was well acquainted with, and in fact related to, two jurors who had served on the jury panel. Because it then appeared that the two jurors referred to had not responded truthfully to questions posed on pre-trial voir dire,[4]

---

**2.** Indeed one court has indicated that regardless of the explicit terms agreed to it is implied that:

As a precondition of the plea bargain, the accused is required to be truthful about his own complicity—i.e. to acknowledge his guilt. *United States v. Mannino*, 551 F.Supp. 13, 21 (SDNY 1982).

**3.** An analogous situation is presented in the attorney/client privilege context.

The fact that a defendant testifies in his own behalf does not effect a waiver of the [attorney client] privilege. But if, in testifying, he refers to a communication with his attorney, he thereby waives the privileged character of

such communication, particularly where his testimony reflects upon the attorney. Likewise, an accomplice, who testifies for the prosecution in such a way as to incriminate himself as well as others, thereby waives the privileged character of communications with his attorney.

*See* Wharton's Criminal Evidence § 561, at 82–84. (13th Ed.1973).

**4.** During voir dire examination a list of all prospective witnesses is read to the venire. Members of the jury panel are then asked whether they recognize any of the names mentioned, and if so, to indicate that to the court.

the court scheduled a hearing at which these jurors were examined. The hearing was conducted in accordance with the procedures outlined in Superior Court Criminal Rule 24(a) [5]. The judge informed the respective parties that he would ask the majority of the questions and would consider any proposed questions or other input from either party.

At the hearing, defense counsel submitted a list of proposed questions, and the court explained the procedures which would be followed:

> What I would propose to do is call the jurors in, question them and then if counsel have any particular points that you think have not been covered you can write them on a yellow pad and hand them up when I am done and I will consider further questioning.

The judge proceeded to conduct an examination of these jurors, inquiring with particularity into any possible familiarity with the witness in question. During its inquiries the court permitted defense counsel to submit additional questions. Only repetitive questions were prohibited.

One of the jurors testified that she had no familiarity with the witness in question. The other juror stated that although he did not recognize the witness' name, her face was familiar. However, the juror was confident that the limited knowledge which he possessed had not influenced the weight which he accorded her testimony.

The trial court denied defendant's motion for a new trial. Among the reasons given for the ruling was the court's finding that the witness who said she was well acquainted with the two jurors was not a reliable witness.

The court also observed that if either of the jurors was, in fact, related to or acquainted with the defense witness, these jurors would be more inclined to receive this witness' testimony in a light more favorable to the defendant. Apparently, it was for this reason that members of defendant's family (who also believed that the defense witness knew the jurors in question) waited until after the guilty verdicts to bring such concerns to the court's attention.

■ Most persuasive, however, was the fact that the defense witness in question had testified during the trial as to matters which were never disputed by the State, *i.e.* that Baxter and Riley were the active participants in these crimes. Consequently, even if some relationship between the jurors and the witness had been established, the prejudicial effect, if any, was likely to have been insignificant.

Defendant asserts, however, that the trial court erred in failing to conduct a more extensive evidentiary hearing as to possible juror bias based on their relationship with the witness. Relying on an order issued by this Court in *Hughes v. State*, Del.Supr., No. 260, 1983, Herrmann, C.J. (Oct. 31, 1983) (Order), defense counsel insist that they should have been allowed to examine and cross-examine the jurors personally.

■ We hold that defendant's reliance on *Hughes* is misplaced. The procedures which were mandated by this Court in that case were employed to deal with a unique situation. They were not intended to set a

---

**5.** The pertinent part of the Superior Court Rule reads as follows:

RULE 24. TRIAL JURORS

*(a) Examination.* In addition to any examination required by statute, the Court shall permit or conduct such examination as is reasonably calculated to ascertain prejudice of a juror. The Court may permit the defendant or his attorney and the Attorney General to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the Court shall permit the defendant or his attorney and the Attorney General to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper. All questions proposed by an attorney to be used in voir dire examination shall be submitted to the Court in writing before commencement of the drawing of the jury or at such other time as ordered by the Court.

standard to be employed in all post-verdict hearings. It is our opinion that the voir dire procedures employed by the trial court in this case were adequate. The court permitted defense counsel to submit questions and to personally explore valid areas of concern. Furthermore, defendant has failed to suggest any particular matters that were not addressed by the court. There is no indication that he was prejudiced in any way by the limitations placed upon counsel during the proceedings.

■ Defendant also asserts that the testimony of the jurors at the post-verdict hearing indicated that one or both jurors had failed to disclose their relationship with the defense witness, and that this failure warranted the granting of a new trial. We find this argument to be entirely without merit.

■ Courts are extremely hesitant to delve into the sanctity of a jury's verdict. *Barnes v. Toppin*, Del.Supr. 482 A.2d 749 (1984); *Styler v. State*, Del.Supr., 417 A.2d 948 (1980). However, after hearing the testimony of the defense witness, the trial judge agreed to examine certain jurors. We have already ruled that the nature and scope of these proceedings were adequate.

■ A trial judge has the unique opportunity to observe the demeanor of each witness and to evaluate his or her credibility. Determinations by a trial judge as to the eligibility of jurors to serve (or to have served) are entitled to great deference by appellate courts and are not reversed absent an abuse of the very broad discretion afforded trial judges in making such decisions. *See Dutton v. State*, Del.Supr., 452 A.2d 127, 144 (1982); and *Styler v. State*, Del.Supr., 417 A.2d 948, 953 (1980). Here the trial judge carefully considered and evaluated the conflicting testimony. He decided that the jurors' testimony was worthy of belief and that some of what the defense witness said was not worthy of belief. That conclusion was adequately supported by the record and the ruling of the judge did not amount to error or an abuse of discretion.

### III

Another contention presented by defendant is that certain remarks made by the prosecutor in his rebuttal summation were prejudicial to defendant and constituted reversible error. In particular, defendant objects to the prosecutor's assertions that defense counsel had not acted in good faith in stating his opinion of the facts and circumstances surrounding this case.

■ In our consideration of allegations of improper prosecutorial comment, this Court has noted that only those statements which prejudicially affect the accused's substantial rights to a fair trial will require reversal. *Sexton v. State*, Del.Supr., 397 A.2d 540, 544 (1979). In the present situation, the prosecutor's comment appeared to impugn the credibility of defense counsel and not that of the defendant himself. The remark was inappropriate, but, under the circumstances, the danger of prejudice to defendant, if any, was minimal. When evaluated within the context of the State's entire summation, this isolated, single comment cannot be said to amount to reversible error.

### IV

Defendant finally asserts that the trial court erred as a matter of law when it denied defendant's motion for judgment of acquittal. Defendant insists that the evidence did not support the jury's guilty verdict and must, therefore, be overturned by this Court. This contention is without merit.

■ When deciding motions for acquittal, the trial court must consider the evidence and all reasonable inferences to be drawn thereon, but these factors must be evaluated in the light most favorable to the State. *Edwards v. State*, Del.Supr., 285 A.2d 805 (1971). Considered in this context, a jury's verdict will be overturned only if the State has failed to offer suffi-

cient evidence to sustain a verdict of guilt. *Conyers v. State*, Del.Supr., 396 A.2d 157, 160 (1978); *Vouras v. State*, Del.Supr., 452 A.2d 1165, 1169 (1982). The evidence presented in this case, as previously outlined herein, is deemed to be sufficient to support a verdict that defendant was guilty of robbery and of conspiracy to commit robbery. Therefore, the Superior Court did not err when it denied defendant's motion for judgment of acquittal.

\*   \*   \*   \*   \*   \*

Defendant's convictions are

AFFIRMED.